Good morning, Your Honors. May it please the Court. My name is Stuart Sandhouse. I represent the appellant in this matter, Judy Leung. I'd like to reserve, Your Honors, five minutes of my time to rebuttal. The primary purpose of ERISA is to protect planned participants. This Court recognized in Abadi v. Alta Health, and the Supreme Court recognized that in Metropolitan Life v. Glenn. The importance of protecting planned participants had become crystal clear with the outrageous revelations of the Union Providence scandal. Well, I guess the whole thing on this is I know that the party's asked to do supplemental briefing on that. Yes, ma'am. In every ERISA case, we all know that Glenn happened, so we felt that it was adequate that you could talk about it here. Sure. How did Glenn impact Abadi? How does it change our analysis here? Well, essentially, the Supreme Court essentially reemphasized its findings or its holdings in Firestone. Well, and it sort of seems for once maybe the Ninth Circuit sort of got it right. The Ninth Circuit did get it right. Abadi is very consistent with the Supreme Court. But the Supreme Court went a little bit further in the sense that it has the ability to do that. Essentially, the Supreme Court indicated that if an administrator is entitled to discretionary review, that it doesn't matter what evidence comes before it in terms of a conflict, you're never going to get to a de novo review. Basically, if you have an abuse of discretion, if you have abuse of discretion, then you're always going to have an abuse of discretion. And the fact that you may have some egregious conflict up here, you're not going to get de novo review. But what the court also said, and this is, again, in the spirit of Abadi, that basically the conflict is one of many factors that have to be considered by the court in reviewing a planned fiduciary's adverse determination. Now, where that becomes important, and this is consistent with Abadi, where the court indicated that if the content was so egregious that it would probably lead to de novo, then why would it lead to de novo? Because it's obvious that the administrator didn't exercise any discretion, so why should the court give it any discretion? But in Glenn, essentially Glenn clarified that. This says, look, when the court weighs these issues, there could be evidence of a conflict that is so egregious, my terms, that it's going to be tantamount to an abuse of discretion in and of itself. So that's an important distinction. You can't go for an abuse of discretion to de novo, and we argued our case pursuant to Abadi where we believe that this case required a de novo review. But we're not going to get it. So what we are asking for is that the court look at this case with the very, very keen eye that is required by Glenn. Now, the other key issue in Glenn, which is quite extraordinary, I think we're all familiar with the Union Providence scandal, essentially where a planned administrator, an insurance company, was a renegade. Unum is the largest disability carrier in the world, and basically their conduct was just absolutely outrageous. It created a public policy nightmare, and the 9th Circuit addressed this in a very recent case. It was Burke. I believe it was Burke. No, not Burke. Excuse me. I think it was Saffon. And the court said, look, the plaintiff's attorney or the appellant's attorney in that case asked the court to remove, basically asked the court to throw out the discretionary clause because the state of California took away the certification of the defendant company because they had a discretionary clause. Well, the court said, look, it's premature because the legislature has to do this. Secondly, the court said quite expressly that we believe that this is going to go through, and that since there is a safe harbor for states to regulate insurance, that this is precisely an insurance regulatory function. So in that case, the 9th Circuit has indicated that, at least in their opinion at this point, that this will not be subject to risk of prevention. I think the days of discretion from a public policy standpoint is basically going away. Remember, the Unum-Providence scandal resulted in a 48-jurisdiction, the settlement of 48 jurisdictions in California. Mr. Sanhouse, without trying to interfere with the discursion, can we relate that to our case? Yes, Your Honor. If we may. Yeah. And essentially what we have in this case is essentially we have conduct in this case that is really tantamount to conduct that was identified in the Unum-Providence case as bad faith practices, practices that were targeted by the investigators. And we have that in this case. Essentially, those deciding whether a claimant receives benefits are fiduciaries. And in Glenn, where it becomes a crucial argument here is that the Supreme Court went further than merely saying what a fiduciary has to do, that they have a fiduciary duty. The Supreme Court said, look, if you're a planned fiduciary, we have certain expectations from you. And we're going to tell you. We have a blueprint. We're going to tell you what our expectations are, what a planned fiduciary must do. And they listed that. They specified that clearly in Glenn what the expectations of a planned fiduciary is. And also the Supreme Court swept away any ambiguity that the purpose of ERISA, the primary purpose of ERISA and congressional intent is to protect the beneficiaries' benefits. That is the paramount process. And the bottom line, as we'll see in this case, that basically from the beginning to the end of this case, this insurance company put its own interests first. The interests of Judy Leon came second, a distant second. And essentially, ERISA deprives Judy Leon the right to sue Kemper for emotional distress But it shouldn't deprive her of her monthly disability benefits, too. Could I ask you a question that goes directly to our case? Yes. I note that one of the things that was done in the Kemper explanation talked about requiring some objective data, such as a number of items. And then it goes on to say that relevant documentation would include but not be limited to, and one item is an evaluation from a psychiatrist, and the second one is the thing that you're attacking as a requirement, and that is, I think it's pronounced, Ergonobin study. Now, my question is, what's the meaning of saying that something would include but not be limited to? Are they saying in that that it's required, or are they saying it may include but not be limited to? In their denial letter, Your Honor, the word is, you must submit objective evidence, and the preceding word is, you must. And Ergonobin testing is dangerous. Ergonobin testing is non-FDA approved. Ergonobin testing is experimental. And according to a preeminent interventionist cardiologist at the Scripps Institute, who is Mrs. Leon's physician and who has made her wife, as specified in the report, in the catheterization lab, this test may lead to sudden death for Mrs. Leon, and she would absolutely refuse this to ever do it. Now, you don't need an Ergonobin test to diagnose prismatolangina. You don't. Essentially, and with regard to that test, this court in SAFON very recently, in a case that argued for a functional capacity evaluation. Where in the record does it say that that would be the only proof that she could give? Oh, well, yeah. This goes to their denial letter, Your Honor. And let me just get to that. Well, that's what I was reading from, Counsel, and the question that I posed to you was the direct one that said, they have to include objective data. But then it goes on to say that that relevant documentation would include, but not be limited to, and one of the two things they're talking about is the cardiac catheterization Ergonobin study. And my question to you is, does that read as though that must be done, or is it one of the items that can be done? Your Honor, the letter specifies it must be done. It's specified, it is specified in the denial letter. Well, read me the words. I don't read those words that way. Okay. I read that that's one of the tests that you could do. What the must is that you have to give some objective proof. Well, Your Honor, objective proof is there. Basically, the objective proof is there. And I can, I'll have to, I'm sorry, Your Honor. Excuse me, but I go ahead and look at this December 11, 2002. I guess that's the denial on appeal. And they indicate, again, they disagree that Dr. Borneri's reports and narratives are sufficient. But then they say ST, that they're looking for a demonstration of ST segment elevation by EKG or documentation during Holter monitoring. Was that sort of evidence submitted in the record? ST, the reports. I think you can answer that yes or no. Well, in terms of the ST, there is evidence of ST upsloping. But that is not, but the problem with, but there is evidence of ST upsloping in there. But you don't have to have that to make a diagnosis of presbental angina. And they also ask for Holter monitoring as would be objective evidence. There was no Holter monitoring, there was no Holter monitoring testing submitted. There was no Holter monitoring submitted at that time. You're, unless, I want to, if Judge Acuda doesn't have any other questions, if you want to reserve any time, you should sit down now and wait and reserve. Okay. Because you're at 2.20. I'll do so. Okay. Good morning. Good morning, Your Honors. May it please the Court, Rachel Urquhart on behalf of the appellees. I want to first address whether there is evidence of ST segment elevation in the record. And there is none. The record that Ms. Leon has referred to is a record of ST segment depression. And those are two different things. Elevation, so when you have those monitors with the little line that reads how your heart is doing. Depression is when the line drops below the middle. Elevation is when it drops above. And so what Ms. Urquhart said is that up-sloping and down-sloping just describe how that line either goes up or down. It could slope down. It could slope up. What she had was. But you can slope down and up below the line. Yes. So what she had was up-sloping depression. So it didn't jag straight down. It sloped as it depressed. So there is no indication, no evidence in the record that she had ST segment elevation. And that is the component that is in the American cardiology. Well, the appellant suggests or states that the denial letter requires her to submit to this dangerous test. What is your position on that? The denial letter did not require her to submit to it. It listed it as a test that could provide evidence of this ST segment elevation. Well, counsel, that's really the question I was posing, and I read it to him. When you say that relevant documentation would include but not be limited to, the normal usage of language for that purpose is it will include, although it's not limited to that. That is, we may require more. It didn't say may include but not be limited to. Well, my question is, is that just an inartful use of language, and therefore it should not be read as requiring the Ergonavine study? Or what's your position on that? It is an inartful use of language. Obviously, it says it is not limited to, and it's giving examples. They weren't requiring that she both do a mental psychological study and do an Ergonavine test. And they could have listed other tests, such as the halter monitoring and other tests that might show the ST segment elevation. They gave two examples of the type of documentation that might show that her angina. That's sort of out of sync with, as I say, the normal usage of would include, and that's the reason I asked you whether that was just kind of inartful use of the language. Normally, if you're talking about something that's permissive, you would say it may include but not be limited to because you put in the hedge about not limited, which means dealer's choice. You can use other things that provide other objective things as well. Yes, Your Honor, but even in her doctor's letters, it's clear that even if she did have Prince-Meadow's angina, which we feel is not established under the American College of Cardiology guidelines, even if she did have that, that is not disabling unless it is comorbid with another heart condition. So her doctor states in both of her letters submitted to the plan that the prognosis for Prince-Meadow angina is good, unless you have some other occlusive vascular disease or some other heart condition that in conjunction that angina pressure could become life-threatening, put her at risk of heart attack. What she states is that Ms. Leon does not have that yet. She's at risk of developing it if she develops more high blood pressure, more hardening of the arteries, but at this point, she's just showing a pre-indicator of those conditions. She does not yet have the comorbid conditions that would be necessary for it to be a life-threatening condition. What's the testimony about that the times that she has the chest pains are not consistent with this particular diagnosis? Prince-Meadow angina usually occurs early in the morning. She's saying that she feels it when she's stressed. The American cardiology guidelines actually say that stress does not cause Prince-Meadow angina, and that is one of the reasons why, in the early state, possibly a mental condition might be the cause of the angina, but she submitted no evidence to support that. So there's a conflict between her doctor's diagnosis for Prince-Meadow angina and the actual objective evidence that was submitted to the plan. She also had several heart tests where, if she had Prince-Meadow angina, they might have indicated that ST-segment elevation, and in none of those was there any ST-segment elevation. I would also like to address, under the ABADI-slash-MetLife standard, the district court noted that the actions of the claims administrator in this case did not reflect any self-interest. Ms. Leon asked for an extension of time to submit her appeal. That timeline was granted. She actually submitted her appeal documents that were received by the claims administrator two days late. They didn't say, no, we're not going to consider this. They went ahead and sent it out for appeal review. Then some 30 days later, she sends in another letter from her treating physician. And again, the claims administrator did not say, no, you missed the deadline. We're not going to consider this. They sent that letter out for another review by their consulting cardiologist. So there they demonstrated that they were not being influenced by any financial conflict of interest. They were putting the plan participant's interests first. Does Kemper still have Dr. Pianco on their preferred provider list? Kemper actually is in runoff status. So, no, they would no longer have him. They might want to take a second look at that, given the background that's outlined here. But that doesn't go to his decision in this case. Yes. And also, Dr. Pianco was used on the first level of review. ERISA does not even require that a claims administrator consult with a medical expert at the first level of review. That's only required at the appeal review. And Ms. Leon submitted the American College of Cardiology guidelines in her appeal. All of those guidelines support the recommendations of Dr. Pianco and Dr. Feldman. I would like to address the contractual limitations in the plan, because that also provides a reason that this case should be dismissed without even addressing the substantive issues under ERISA. Plaintiff tries to avoid the application of the contractual limitations period by arguing ambiguity. But her own conduct indicated that she understood when proof of claim is due. In her appeal submission, which is in the record at ER 422, she stated on January 14, 2002, she timely completed her notice and proof of claim for long-term disability benefits. Now she's trying to argue that the requirement for one proof of claim should be submitted. It's too ambiguous to be understood, and therefore a contractual limitations period running from the start of that timeline cannot be applied. It does seem to lack a certain crispness, right? I mean, in some places you say proof of claim. In some cases you say proof of loss. It's pretty hard to draw a straight line and say it's clear when the claim would accrue. There's different times when you would also request additional proof of loss, but in this case it was an initial claim requiring that proof of claim be provided as soon as disability occurs or as soon as possible thereafter, but no later than one year after when the disability arises. She was able to provide that claim by January 14, 2002. She so states in her appeal... But you do have ambiguous things. For example, the plan says explicitly allows a claimant to submit proof as soon as reasonably possible after becoming disabled, provided it is not later than one year from the time proof is otherwise required. The plan further provides that such proof may be required from time to time  Another section is entitled Notice of Claims. It provides that once a person notifies Kemper that she is unable to work, she will be provided forms for furnishing Kemper with proof that she is unable to work due to the sickness or injury. If the forms do not arrive within 15 days of notification, the claimant can send written proof without continuing to wait for Kemper's forms. It's like when you read them all together, you've got initial proof of the disability 94 days after the date of her disability. Nothing in the record indicates that you considered it untimely. No, we did not consider it untimely because she did provide it as soon as possible and within that one year. So even reading any ambiguity in the possible Light Most Favorable to Plaintiff, that would be one year after disability arises, October 12, 2002. Three years from that date would be October 12, 2005. She did not file this lawsuit until December of 2005. So even in the Light Most Favorable to the claimant, she did not file this lawsuit within the required time period. And that time period is reasonable. There is several... Just back up for one second. So the plan provision says you may not start a legal action more than three years after the date when proof of your claim was required. Now what's the language that informs the claimant when proof of the claim was required, the specific language?  As soon as due when disability arises, or as soon as possible thereafter, but no later than one year. But it doesn't use the... Does it use the language proof of claim? In the math it says proof of claim is required at X date. Where is that language? It refers back to notice and proof of claim being due 90 days before when the long-term disability period begins. But basically that is based upon the notion that the benefits qualifying period begins on the very date of disability and then runs out 90 days after that? Correct, Your Honor. And that's really... When you're inquiring about somebody making a submission with documentation, the idea of saying that we're going to start the clock ticking on the very date of the disability seems extraordinary, doesn't it? Well, in this case, Ms. Lehm has also worked for an employer that provided short-term disability benefits, which were also administered but not insured by the Lumberman's group of companies. And so for the short-term disability benefits, that proof of claim was also due on the day disability arises. So we go from this language about when the proof of claim is due to language that talks about proof that you are unable to work but it has to be filed not later than 90 days prior to the end of the benefit qualifying period. And the benefit qualifying period definition, again, doesn't use proof of claim. So it's very hard to draw a line and say, here's what the contract requires, even not having any... reading it in favor of either party. So I'm having a little trouble with your argument on this. But in this case, Ms. Lehm's conduct indicated that she understood when proof of claim was due. And, you know, she so stated in her appeal submission that on January 14, 2002, Lehm timely completed her notice and proof of claim for LTD benefits. But doesn't her conduct when she filed the action, which you say is late, indicate her understanding that she wasn't? A different reading of the contract? I don't see how you can put too much weight on her subsequent conduct. I mean, she obviously didn't think that any limitations period in the contract applied to her. She's not arguing that the three years from proof of claim is ambiguous. She's arguing just the proof of claim, when proof of claim is due, is ambiguous. And her conduct has shown that she understood the when proof of claim language applied to her. And her conduct demonstrating that she can't now take a different argument and plead ambiguity to avoid application when she's shown by her own conduct  January 14, 2002. And I do want to address the reasonableness of this limitation. Taking, you know, the denial of December 11, 2002, she had until October 11, 2004, to file her claim. So she had plenty of time to investigate and file her lawsuit. She was not prejudiced by this limitation in any way. And she also argues about accrual. And she cites to a regulation under ERISA that applies to a second voluntary level of appeal, not to the mandatory first level of appeal. That was all that was required under this plan. So ERISA clearly contemplates that there would be no tolling during the time of the initial claim decision making and the mandatory administrative appeal. So I submit that the contractual limitations period still applies. But going back to the district court's decision, which was that the administrator had a reasonable basis for denial of benefits, based on the fact that there was no objective evidence in the record that she had a heart condition that placed her at threat of death by continuing to work. Plaintiff cites to a couple of cases in his reply brief. To wrap it up, you have two seconds. And I just submit that none of those cases are applicable to the facts in this situation. Thank you, Your Honor. Thank you, Your Honor. May it please the Court. If we had extensively briefed the contract issue, contractual limitation issue in our briefs, is there any questions that I can answer regarding that? We believe that, again, our position is this, that the contract is hopelessly uncertain and that the federal rule should apply, where the trigger for the limitation period should occur subsequent to the final denial of the claim. That's the federal rule. And essentially, the federal rule follows the California rule in terms of limitations, which is four years. Notwithstanding that, because of the uncertainty as we specified, Ms. Leon filed her claim within three years subsequent to the final denial. And, again, we expressed that in the Court. There are other policy issues we raised, but unless you have a question about that, I'll move on quickly here. Let me, essentially, what Your Honor had brought up about Dr. Bianco, this is what we're talking about in terms of this case. This case was not reviewed pursuant to the dictates of a body and met life, though met life wasn't decided at the time. And the conduct of temper, again, is more indicative of Union Providence than anything else. Dr. Bianco was hired, as Your Honor had noted, I think we've shown enough evidence in our brief that Dr. Bianco is a You only have 30 seconds, so you need to wrap up. Okay. All right. Well, the bottom line is Dr. Bianco rendered basically was essentially, he was one of the two, he was identified as one of the worst doctors in Florida. Two percent of other Florida physicians who had, he had six malpractice claims within a five-year period and basically 1.7 million were paid on behalf of his claims. If you look at the deposition in the report, basically, he misdiagnosed somebody with a peptic ulcer who had a severe cardiac disease who died. Okay. Secondly, and basically You're already on overtime. You have 30 seconds and I'm going to call you. Basically, Dr. Bianco specified, and we specified this, they asked Dr. Bianco if Leon should have any restrictions. Yes. He said she should avoid stress and should avoid a heavy workload. That is precisely the definition of disability, which is basically you can't do essential functions. As a senior vice president and as a senior partner, he's telling her that she can't, that she has to avoid stress and that she has to avoid a heavy workload. That's in his report. Finally, to wrap it up, Dr. Feldman. Dr. Feldman specified in his final report that the narrative This is from Dr. Guarneri. The narrative conclusively demonstrates that the client is Okay, I'm sorry. Basically, Dr. Feldman specified that Dr. Guarneri's narrative specified a diagnosis of prismatal angina and that the plaintiff was disabled by it. Then he goes on to ask basically just poke holes. But there's no requirement for objective evidence. There is objective evidence in that. Dr. Feldman specified that. There's nothing in the contract about objective evidence. They have basically just, they've invented new provisions to do this. We're familiar with the record and we've read the briefs. And so this would conclude oral argument. Thank you, Your Honor. I apologize. Thank you for your argument. Thank you, Your Honor.
judges: Callahan, Ikuta, Shadur